NOTICE: Under Supreme Court Rule 367 a party has 21 days after the

filing of the opinion to request a rehearing. Also, opinions are

subject to modification, correction or withdrawal at anytime prior

to issuance of the mandate by the Clerk of the Court. Therefore,

because the following slip opinion is being made available prior to

the Court's final action in this matter, it cannot be considered

the final decision of the Court. The official copy of the following

opinion will be published by the Supreme Court's Reporter of

Decisions in the Official Reports advance sheets following final

action by the Court.

                                    

              Docket No. 78198--Agenda 22--September 1995.

     THE COMMITTEE FOR EDUCATIONAL RIGHTS et al., Appellants, v. JIM

      EDGAR, Governor of the State of Illinois, et al., Appellees.

                     Opinion filed October 18, 1996.

     JUSTICE NICKELS delivered the opinion of the court:

     This appeal draws us into the sensitive and controversial area

of public school finance. The plaintiffs in this action are the

Committee for Educational Rights (which consists of more than 60

school districts associated pursuant to an intergovernmental

agreement), the boards of education of 37 school districts named

individually, and a number of students and their parents. The

defendants are Governor Jim Edgar, the State Board of Education and

State Superintendent of Education Joseph A. Spagnolo. Plaintiffs

brought this action in the circuit court of Cook County seeking a

declaratory judgment that the statutory scheme governing the

funding of public schools violates various provisions of the

Illinois Constitution of 1970. The trial court dismissed the

complaint and the appellate court affirmed. 267 Ill. App. 3d 18.

The appellate court issued a certificate of importance under

Supreme Court Rule 316 (155 Ill. 2d R. 316) giving rise to the

present appeal. We affirm the appellate court, which affirmed the

dismissal of plaintiffs' complaint.

                                BACKGROUND

     We begin with a general and vastly simplified description of

those aspects of public school finance in Illinois that are germane

to this appeal. Public schools receive funds from various federal,

State and local sources. The controversy in the present case hinges

on the relationship between funding derived from local property

taxes and funds supplied by the State. Under the School Code (105

ILCS 5/1--1 et seq. (West 1994)) school districts are authorized to

levy property taxes for various school purposes up to specified

maximum rates. See, e.g., 105 ILCS 5/17--2, 34--53 (West 1994). The

voters of a school district may authorize higher property tax rates

by referendum, but even with such voter approval the School Code

places an upper limit on school property tax rates. 105 ILCS 5/17--

3, 17--4, 17--5, 34--53 (West 1994). Obviously, the amount which a

school district is able to raise through property taxes is

determined by the taxable property wealth within the district.

Wealthy districts--those with substantial taxable property wealth

per pupil--are able to raise more revenue per pupil at a given tax

rate than poor districts.

     There are principally two categories of State financial

assistance which supplement local property tax revenues and other

local sources of funding. First, the State provides assistance to

school districts in the form of categorical grants for a variety of

specific purposes. See, e.g., 105 ILCS 5/2--3.51 (West 1994)

(reading improvement programs); 105 ILCS 5/2--3.65 (West 1994)

(arts programs); 105 ILCS 5/18--7 (West 1994) (teacher retirement

benefits); 105 ILCS 5/27--24.4 (West 1994) (driver education

programs); 105 ILCS 5/29--5 (West Supp. 1995) (student

transportation). School districts also receive distributions of

general state aid from the State's common school fund pursuant to

the formula set forth in section 18--8 of the School Code (105 ILCS

5/18--8 (West Supp. 1995)).

     General state aid is distributed based on a weighted average

daily attendance (ADA) at schools within a particular district and

on the equalized assessed valuation (EAV) of property in the

district. The general state aid formula is designed to enable

districts with modest property tax bases to achieve a certain

minimum level of funding per pupil. This minimum funding level,

commonly known as the "foundation level," is computed by the State

Board of Education based on the amount available for distribution

from the common school fund. The foundation level represents a

hypothetical "guaranteed" dollar amount of taxable property wealth

per pupil (hereinafter, guaranteed EAV) (see 105 ILCS 5/18--

8(A)(5)(a) (West Supp. 1995)) multiplied by a specified tax rate

(hereinafter, foundation rate) (see 105 ILCS 5/18--8(A)(5)(d)(2)

(West Supp. 1995)). The amount of general state aid per pupil that

a particular district receives is calculated by subtracting the

district's EAV per weighted ADA pupil from the guaranteed EAV and

multiplying the difference by the foundation rate. The formula may

be expressed as follows: general state aid per weighted ADA pupil

= (guaranteed EAV   district EAV per weighted ADA pupil) x

foundation rate. See 105 ILCS 5/18--8(A)(5)(d)(2) (West Supp.

1995). This formula is structured to provide that if a district

levies property taxes at exactly the foundation rate, the sum of

local revenues and general state aid will equal the foundation

level. In order to receive full state aid under this formula, the

district's local tax rates must equal or exceed a specified minimum

"qualifying" rate (which is lower than the foundation rate) but

the amount of aid received does not otherwise depend on the actual

local tax rates applied. See 105 ILCS 5/18--8(A)(5)(d)(1),

(A)(5)(d)(2) (West Supp. 1995). Thus, to receive the full amount of

general state aid the district must tax at or above the

"qualifying" rate. To achieve foundation level funding, the

district must tax at the foundation rate. Where a district's local

tax rate exceeds the foundation rate, the sum of local revenues and

general state aid will exceed the foundation level.

     The above method of distributing general state aid only

applies in districts where the EAV per weighted ADA pupil is less

than 87% of the guaranteed EAV. 105 ILCS 5/18--8(A)(5)(e) (West

Supp. 1995). In wealthier districts, an alternative formula

applies. The minimum amount of general state aid under the

alternative formula is fixed at 7% of the foundation level. 105

ILCS 5/18--8(A)(5)(f) (West Supp. 1995).

     In their five-count complaint, plaintiffs allege that under

the present financing scheme, vast differences in educational

resources and opportunities exist among the State's school

districts as a result of differences in local taxable property

wealth. During the 1989-90 school year, the average tax base in the

wealthiest 10% of elementary schools was over 13 times the average

tax base in the poorest 10%. For high school and unit school

districts, the ratios of the average tax bases in the wealthiest

and poorest districts were 8.1 to 1 and 7 to 1, respectively,

during the 1989-90 school year.

     Plaintiffs allege in their complaint that the general state

aid formula does not effectively equalize funding among wealthy and

poor districts. While the general State aid formula ensures minimum

funding at the foundation level, the wealthiest districts are able

to raise funds through property taxes considerably in excess of the

foundation level. Moreover, the provision of a minimum grant--equal

to 7% of the foundation level--to even the wealthiest school

districts is counterequalizing.

     Plaintiffs allege that disparities among wealthy and poor

districts are reflected in various measures of educational funding;

in several "key indicators" of educational quality (such as the

percentage of teachers with master's degrees, teacher experience,

teacher salaries, administrator salaries and pupil/administrator

ratios); and in a comparison of the facilities, resources and

course offerings in two neighboring school districts with

dramatically disparate tax bases. According to the complaint, these

disparities are attributable to variations in property wealth

rather than tax effort; on average, the poorest school districts

tax at higher rates than the wealthiest.

     Based on these allegations, in counts I through III plaintiffs

seek a declaratory judgment that to the extent that the statutory

school finance scheme "fails to correct differences in spending and

educational services resulting from differences in [local taxable

property wealth]" the scheme violates our state constitution's

equal protection clause (count I), prohibition against special

legislation (count II) and education article (count III). Ill.

Const. 1970, art. I, §2; art. IV, §13; art. X, §1.

     Counts IV and V of the complaint pertain to the educational

opportunities available to certain socio-economically disadvantaged

children who are at risk of academic failure (at-risk children).

Plaintiffs allege that at-risk children frequently exhibit

educational deficits and require early intervention in order to

succeed academically. Section 2--3.71 of the School Code (105 ILCS

5/2--3.71 (West 1994)) provides for a grant program administered by

the State Board of Education for the establishment of preschool

educational programs addressing the needs of at-risk children.

Plaintiffs allege that such programs are effective in correcting

the educational deficits that at-risk children suffer, but grants

under section 2--3.71 and other sources of funding are sufficient

to provide such programs for only a fraction of the children who

need them. Plaintiffs seek a declaratory judgment that by failing

to provide sufficient funding for preschool educational programs,

the State's system for financing public education violates the

equal protection clause (count IV) and education article (count V)

of our state constitution.

     The trial court dismissed plaintiffs' complaint for failure to

state a cause of action. The appellate court affirmed the judgment

of the circuit court and issued a certificate of importance

pursuant to Supreme Court Rule 316. With leave of this court, the

League of Women Voters of Illinois and the Mexican American Legal

Defense and Education Fund have jointly filed an amicus curiae

brief in support of plaintiffs. On appeal, plaintiffs do not

challenge the dismissal of their special legislation claim.

However, plaintiffs contend that the trial court erred in

dismissing their claims under the equal protection clause and the

education article.

                                 ANALYSIS

                                     I

     We first consider the dismissal of plaintiffs' claims that the

statutory system for financing public schools violates the

education article of our state constitution. Section 1 of article

X of the Illinois Constitution of 1970 provides:

               "A fundamental goal of the People of the State is

          the educational development of all persons to the limits

          of their capacities.

               THE STATE SHALL PROVIDE FOR AN EFFICIENT SYSTEM OF

          HIGH QUALITY PUBLIC EDUCATIONAL INSTITUTIONS AND

          SERVICES. Education in public schools through the

          secondary level shall be free. There may be such other

          free education as the General Assembly provides by law.

               The State has the primary responsibility for

          financing the system of public education." (Emphasis

          added.) Ill. Const. 1970, art. X, §1.

     Plaintiffs' challenge to the statutory system for financing

public schools is based on the emphasized language above. First,

plaintiffs contend that because the system produces vast

disparities in the level of funding and educational resources

available to various school districts based on differences in local

taxable property wealth, it is not "efficient" within the meaning

of the constitution. Second, plaintiffs argue that school districts

with low property tax bases are unable to provide a "high quality"

education to their students due to inadequate funding. Third,

plaintiffs contend that under the financing scheme, funding is

insufficient to provide a "high quality" education to at-risk

children.

     Before proceeding, we note that plaintiffs' second argument is

essentially raised for the first time on appeal. While in count III

of their complaint plaintiffs allege that the quality of public

education is comparatively better in wealthier districts, as we

read the complaint there is no specific allegation that students

(other than at-risk students) in districts with low taxable

property wealth are deprived of a "high quality" education in

normative terms. Because the theory that poor districts provide a

normatively inadequate education was not raised in the trial court,

we could properly treat it as waived. See Eagan v. Chicago Transit

Authority, 158 Ill. 2d 527, 534 (1994) ("issues not raised in the

trial court may not be raised for the first time on appeal"). We

choose, however, to address the argument on the merits. The waiver

rule is a limitation on the parties and not the jurisdiction of the

courts. Herzog v. Lexington Township, 167 Ill. 2d 288, 300 (1995).

Moreover, a reviewing court may consider an issue not raised in the

trial court if the issue is one of law and is fully briefed and

argued by the parties. People ex rel. Daley v. Datacom Systems

Corp., 146 Ill. 2d 1, 27 (1991); Hux v. Raben, 38 Ill. 2d 223, 225

(1967). As will be seen, plaintiffs' argument regarding the quality

of education, in normative terms, presents questions of law

relative to the power of the courts to adjudicate such a claim. The

controlling questions have been sufficiently briefed and argued to

facilitate review on the merits. Furthermore, the questions

presented are of substantial public importance, and we believe the

public interest favors consideration of the merits. Accordingly, we

will consider this argument, along with those issues properly

preserved for review.

                                     A

     We first consider plaintiffs' argument that the present school

funding system is not "efficient" within the meaning of the

constitution because it produces disparities in educational

resources and services based on differences in local taxable

property wealth. In plaintiffs' view, the efficiency requirement

guarantees some measure of equality in educational funding and

opportunity. Plaintiffs deny that they seek absolute uniformity in

educational offerings or precisely equal spending for each pupil in

the State. Plaintiffs would apparently approve variations in

educational spending from district to district based on criteria

such as local differences in the costs of resources and special

educational needs in particular districts. However, plaintiffs

maintain that a school district's property wealth is "educationally

irrelevant" and is not a proper factor upon which to set the level

of resources available to the district.

     The trial and appellate courts rejected plaintiffs' argument

that the efficiency requirement guarantees parity of educational

funding and opportunity. The trial court emphasized that the

framers of the 1970 Constitution had considered and rejected

specific proposals for a constitutional provision designed to

reduce funding disparities among districts by limiting the amount

of funds that could be raised by local property taxes. The

appellate court concluded that article X of the constitution "does

not mandate equal educational benefits and opportunities among the

State's school districts as the constitutionally required means of

establishing and maintaining an `efficient' system of free public

schools." 267 Ill. App. 3d at 22.

     As this case turns upon the meaning of constitutional

language, a brief summary of the general principles of

constitutional interpretation may be helpful. The meaning of a

constitutional provision depends on the common understanding of the

citizens who, by ratifying the constitution, gave it life. League

of Women Voters v. County of Peoria, 121 Ill. 2d 236, 243 (1987);

Kalodimos v. Village of Morton Grove, 103 Ill. 2d 483, 492 (1984).

This understanding is best determined by referring to the common

meaning of the words used. League of Women Voters, 121 Ill. 2d at

243; Kalodimos, 103 Ill. 2d at 492-93. Where the language is

unambiguous, it will be given effect without resort to other aids

for construction. Baker v. Miller, 159 Ill. 2d 249, 257 (1994).

However, if after consulting the language of a provision, doubt

remains as to its meaning, it is appropriate to consult the debates

of the delegates to the constitutional convention to ascertain the

meaning they attached to the provision. League of Women Voters, 121

Ill. 2d at 243-44; Kalodimos, 103 Ill. 2d at 493.

     "Efficient" has been defined as follows:

               "1 : serving as or characteristic of an efficient

          cause : causally productive : OPERANT *** 2 : marked by

          ability to choose and use the most effective and least

          wasteful means of doing a task or accomplishing a purpose

          ***." Webster's Third New International Dictionary 725

          (1981).

     This definition does not inherently compel the conclusion that

an "efficient system" of public schools necessarily involves

statewide parity of educational opportunity and resources. However,

we do not believe that the precise meaning of the word "efficient"

as used in section 1 of the education article is entirely clear and

free from doubt, or that "efficient" could not conceivably be

interpreted in the manner that plaintiffs claim. We note that the

Court of Appeals of Maryland determined that Maryland's

constitutional requirement that the General Assembly establish a

"thorough and efficient" system of free public schools was "on its

face *** plainly susceptible of more than one meaning." Hornbeck v.

Somerset County Board of Education, 295 Md. 597, 619, 458 A.2d 758,

770 (1983). In determining whether the "thorough and efficient"

provision required exact equality in per pupil funding and

expenditures among Maryland's school districts, the Hornbeck court

deemed it essential to consider the history underlying the

enactment of the provision. Hornbeck, 295 Md. at 619-20, 458 A.2d

at 770. Courts in other jurisdictions with similar constitutional

efficiency provisions have also looked to sources beyond the

language of the constitution to determine the meaning of those

provisions. See Rose v. Council for Better Education, Inc., 790

S.W.2d 186, 205-06 (Ky. 1989); Edgewood Independent School District

v. Kirby, 777 S.W.2d 391, 394-96 (Tex. 1989); Pauley v. Kelly, 162

W. Va. 672, 681-89, 255 S.E.2d 859, 866-69 (1979); see also Rose,

790 S.W.2d at 221 (Vance, J., dissenting) ("It is because of [the]

universal concern expressed by the delegates to the convention that

I conclude that the word `efficient' as used by them must include

not only its dictionary definition but must also be construed to

include the requirement of substantial equality of educational

opportunity"). We shall likewise consider the history underlying

the adoption of section 1 of the education article.

     The education article of the 1970 Constitution originated as

a proposal submitted by the education committee of the Sixth

Illinois Constitutional Convention. 6 Record of Proceedings, Sixth

Illinois Constitutional Convention 227 (hereinafter cited as

Proceedings). At the outset, we note that an introductory passage

in the education committee's report on the proposed education

article states, "[t]he opportunity for an education, where the

state has undertaken to provide it, is a right which must be made

available to all on equal terms." 6 Proceedings 231. Considered in

isolation, this statement might lend some credence to plaintiffs'

position. However, this general statement of principle was not made

in reference to the efficiency requirement or any other specific

language in the proposed education article. Instead, as authority

for this proposition the education committee report cites the

landmark decision in Brown v. Board of Education, 347 U.S. 483, 98

L. Ed. 873, 74 S. Ct. 686 (1954), which was, of course, based on

the equal protection clause of the fourteenth amendment of the

United States Constitution. As explained below, specific references

in the convention record to the efficiency requirement place the

concept in a significantly different light.

     The constitutional requirement that the State provide for an

efficient system of high quality educational institutions and

services corresponds to section 1 of article VIII of the 1870

Constitution, which stated, "The general assembly shall provide a

thorough and efficient system of free schools, whereby all children

of this state may receive a good common school education." Ill.

Const. 1870, art. VIII, §1. Under the 1870 Constitution, this court

consistently held that the question of the efficiency and

thoroughness of the school system was one solely for the

legislature to answer, and that the courts lacked the power to

intrude. People v. Deatherage, 401 Ill. 25, 31 (1948) (and cases

cited); People ex rel. Taylor v. Camargo Community Consolidated

School District No. 158, 313 Ill. 321, 327-28 (1924) ("Whether [a

provision governing detachment of territory from school districts]

tends to affect adversely or favorably the thoroughness and

efficiency of the system of free schools is a legislative question

which is not for our determination"); see also G. Braden & R. Cohn,

The Illinois Constitution: An Annotated and Comparative Analysis

400-01 (1969) ("It has been said that the `thorough and efficient'

requirement was solely a matter for legislative discretion and the

courts will not look into it").

     However, under a limited exception to this principle it was

held that pursuant to the "thorough and efficient" requirement

school district boundaries must be established so that the

districts are compact and contiguous. See People ex rel. Community

Unit School District No. 5 v. Decatur School District No. 61, 31

Ill. 2d 612, 613-14 (1964). As explained in People ex rel. Leighty

v. Young, 301 Ill. 67, 71 (1921), "[i]t cannot be said that a

system which places the school house at a point so remote that the

children of school age cannot reach it conveniently is either

thorough or efficient." School districts organized in contravention

of the requirements of compactness and contiguity have been held

invalid. See, e.g., Decatur School District, 31 Ill. 2d 612; People

ex rel. Goelzer v. Crawford, 310 Ill. 205 (1923) (finding district

invalid under both the constitution and the applicable statute).

     The framers of the 1970 Constitution embraced this limited

construction that the constitutional efficiency requirement

authorized judicial review of school district boundaries, but they

did not intend to otherwise limit legislative discretion. The

education committee's report accompanying the proposed education

article specifically states, "The concept of the efficiency of the

system (already contained in the present Constitution) has been

used by the courts as a guide to the validation of district

boundary changes. The Committee believes it useful to continue this

concept and to add the notion of high quality." 6 Proceedings 234.

     An exchange between Delegates Netsch and Patch during the

debate on section 1 confirms the framers' understanding of the

efficiency concept:

               "MRS. NETSCH: Mr. Patch or Mr. Fogal, could I

          explore just very briefly your use of the word ***

          `efficient' ***. Was this done quite consciously to adopt

          and reincorporate into this constitutional provision all

          of the body of law that has developed with respect to

          that term in the previous constitution?

               MR. PATCH: Yes. In terms of boundaries and in terms

          of quality, so there would be a continuity of education

          based on the law or the court decisions relative to

          efficiency." 2 Proceedings 766.

Careful review of the remainder of the debates on section 1 of the

education article and other relevant materials in the convention

record discloses no persuasive evidence to support the view that

section 1's efficiency requirement was intended by the framers to

function more broadly as a substantive guarantee of parity in

educational opportunity or funding. Accord ILCS Ann., 1970 Const.,

art. X, §1, Constitutional Commentary, at 789 (Smith-Hurd 1993)

("There is no indication that the Convention intended to alter the

line of cases in which the courts have deferred to the legislature

on the meaning of terms such as `efficient' ").

     Disparity in educational funding was a highly charged and

controversial subject during the constitutional convention, but it

was not touched upon to any significant degree in connection with

section 1's efficiency requirement. Instead, the debate over

unequal opportunities and resources ultimately led to the

incorporation of section 1's final sentence, which provides that

"[t]he State has the primary responsibility for financing the

system of public education." Ill. Const. 1970, art. X, §1. That

language did not appear in the education committee's originally

proposed education article. Rather, by a six to five majority, the

education committee had initially proposed a separate section

governing school finance that was designed to achieve greater

parity of educational funding and opportunity by limiting local

contributions to school operational costs to 10% of the amount

received from the General Assembly. See 6 Proceedings 295. Delegate

Bottino, a member of the education committee, submitted an

alternative proposal permitting funding from local taxation in an

amount equal to state funding, and requiring that state funds be

distributed so as to "provide for substantial parity of educational

opportunity throughout the state." 1 Proceedings 622-23.

     The members of the education committee were deeply divided

over the main committee proposal. The committee's majority report

specifically noted that "[a] salient fact of Illinois school

finance is the enormous inequality among the districts with respect

to their resources from local tax receipts" and that "the quality

of education received by any student in the State is largely a

product of the accident of the wealth of his district." 6

Proceedings 297. One of the majority's stated objectives was to

"produce a level of educational opportunity that would be more

equal throughout the State for all children." 6 Proceedings 299.

The education committee's minority report acknowledged existing

inequities in school funding (see 6 Proceedings 300), but sought to

preserve the tradition of local control of public education, which

the minority feared would be imperiled under a constitutional

regime of centralized funding of education. The minority believed

that a system of statewide funding of schools would prove

incompatible with local autonomy in educational decisionmaking.

Simply put, the minority did not believe that it was realistic to

expect that the General Assembly would allow local school boards

and administrators free reign with state funds. See 6 Proceedings

301-02. The minority also objected that:

               "While substantially full [State] support might

          improve the programs of inferior schools, it would lower

          the quality of education in the better schools and make

          it impossible for local citizens to restore these quality

          programs despite their willingness to do so. Local

          citizens might well show less interest in the welfare of

          their schools if they are frustrated in their efforts to

          improve their programs." 6 Proceedings 302.

The minority further expressed the view that educational funding

was "inherently a legislative subject." 6 Proceedings 304.

     The framers of the 1970 Constitution rejected both the

education committee proposal (1 Proceedings 527-28) and Delegate

Bottino's alternative proposal (1 Proceedings 622-23).

Subsequently, however, Delegate Netsch offered an amendment to

section 1 adding the language placing primary responsibility for

financing public education on the State. 1 Proceedings 738.

Delegate Netsch explained that the purpose of the amendment was "to

put the Convention on record" that the State should bear greater

responsibility for school funding both to reduce the burden of

property taxes and to cure inequality in education. 5 Proceedings

4502. Delegate Netsch carefully explained, however, that the added

language was "not a legally obligatory command to the state

legislature. *** [I]t is something that can be pointed to every

time the question of appropriations from the state to the school

districts is at issue." 5 Proceedings 4502. In Blase v. State, 55

Ill. 2d 94 (1973), this court reviewed this background and held

that final sentence of section 1 "was intended only to express a

goal or objective, and not to state a specific command." Blase, 55

Ill. 2d at 98; see also People ex rel. Carey v. Board of Education,

55 Ill. 2d 533, 535 (1973).

     In our view, the foregoing persuasively suggests that the

framers of the 1970 Constitution viewed educational equality and

"efficiency" to be separate and distinct subjects. The framers of

the 1970 Constitution grappled with the issue of unequal

educational funding and opportunity, and chose to address the

problem with a purely hortatory statement of principle. To ignore

this careful and deliberate choice by interpreting the efficiency

requirement as an enforceable guarantee of equality would do

violence to the framers' understanding of the education article.

     Plaintiffs insist that the rejection of the specific funding

proposals merely represents the framers' unwillingness to prescribe

specific funding ratios or formulas in the constitution. According

to plaintiffs, the delegates generally spoke in support of the

general ideal of equalizing educational opportunity. Be that as it

may, we find no significant evidence in the convention record

suggesting that the delegates believed that section 1's efficiency

requirement related to these concerns. The mere utterance of

sentiments favoring educational equality does not itself give rise

to a constitutional guarantee. This court has noted:

          "While statements and reports made by the delegates to

          the constitutional convention are certainly useful and

          important aids in INTERPRETING ambiguous language of the

          constitution [citation], they are, of course, not a part

          of the constitution. It would be improper for this court

          to transform statements made during the constitutional

          convention into constitutional requirements where such

          statements are not reflected in the language of the

          constitution." (Emphasis in original.) Village of

          Carpentersville v. Pollution Control Board, 135 Ill. 2d

          463, 473 (1990).

     Reminding us that the meaning of a constitutional provision

depends on the common understanding of the citizens who ratified

the constitution, plaintiffs emphasize that with reference to the

education article, the "Address to the People" accompanying the

1970 Constitution upon its submission to the voters explains that

"[t]he Convention was greatly concerned with improving and

equalizing opportunities for education." 7 Proceedings 2676. The

articulated "concern" is manifest in the purely hortatory features

of the education article as described above and in Blase v. State,

55 Ill. 2d 94 (1973). The mere expression of concern does not

describe an enforceable constitutional guarantee of educational

equality.

     Finally, plaintiffs contend that several decisions from other

states interpreting similar constitutional language have concluded

that "efficiency" dictates fairness and parity in educational

funding. See Abbott v. Burke, 119 N.J. 287, 575 A.2d 359 (1990);

Rose v. Council for Better Education, Inc., 790 S.W.2d 186 (Ky.

1989); Edgewood Independent School District v. Kirby, 777 S.W.2d

391 (Tex. 1989); Pauley v. Kelly, 162 W. Va. 672, 255 S.E.2d 859

(1979). For various reasons, these decisions provide no persuasive

support for plaintiffs' argument.

     Pauley simply does not stand for the proposition for which

plaintiffs' cite it. In Pauley, the court ultimately defined a

"thorough and efficient" system of schools not in terms of equal

opportunity, but in terms of various specific substantive

educational goals. Pauley, 162 W. Va. at 699-700, 255 S.E.2d at

877. Similarly, in Abbott, the court stated that New Jersey's

"thorough and efficient" clause required "a certain level of

educational opportunity, a minimum level, that will equip the

student to become `a citizen and ... a competitor in the labor

market.' [Citation.] *** If, however, that level is reached, the

constitutional mandate is fully satisfied regardless of the fact

that some districts may exceed it." Abbott, 119 N.J. at 306, 575

A.2d at 369. Indeed, the Abbott court noted that in an earlier

decision the school finance statute was upheld as facially valid

even though it guaranteed the continuation of substantial

disparities in educational expenditures per pupil. Abbott, 119 N.J.

at 308, 575 A.2d at 369, citing Robinson v. Cahill, 69 N.J. 449,

355 A.2d 129 (1976).

     Despite these statements, the Abbott court concluded that New

Jersey was constitutionally required to ensure that education in

poor urban school districts was funded at substantially the same

level as in more affluent suburban districts. Abbott, 119 N.J. at

385, 575 A.2d at 408. The court reached this dubious result

essentially by equating the constitutionally guaranteed minimum

level of educational opportunity with the educational offerings in

the wealthiest districts. See Abbott, 119 N.J. at 364, 575 A.2d at

397; see also Note, State Constitutional Law--Public School

Financing--Spending Disparity Between Wealthy School Districts and

Poor Urban School Districts, Caused By Reliance on Local Property

Taxes, is Violative of the "Thorough and Efficient Education"

Clause, 21 Seton Hall L. Rev. 445, 470 (1991). One writer has

characterized the reasoning employed in Abbott as "an intellectual

shell game" (21 Seton Hall L. Rev. at 477-78), and has suggested

that the variance between the court's description of the "thorough

and efficient" requirement and its ultimate holding "is simply the

imprimatur of result oriented jurisprudence cloaked in superfluous

reasoning" (21 Seton Hall L. Rev. at 480). The criticism is well

founded, and we therefore decline to apply the Abbott court's

analysis in this case.

     The other decisions cited by plaintiffs, Rose from Kentucky

and Kirby from Texas, are of limited relevance because in each case

the construction given the term "efficient" depended in large

measure on historical conditions and considerations (see Rose, 790

S.W.2d at 205-06; Kirby, 777 S.W.2d at 395-96) which are not part

of the history of our own constitution. While plaintiffs place

major emphasis on Kirby, the historical basis for the court's

analysis stands in sharp contrast to the history of our

constitution. In Kirby, the court noted that in 1876, when the

Texas constitution was written, economic conditions and educational

funding were fairly uniform throughout the state, and the framers

never contemplated the gross funding disparities that were later to

develop as wealth grew at different rates in different districts.

Kirby, 777 S.W.2d at 395-96. In contrast, as discussed above, the

framers of the Illinois Constitution of 1970 were well aware of

disparities produced under the local property tax based funding

system. Indeed, inequality was a recognized feature of education in

Illinois when the 1870 Constitution--which introduced the

efficiency concept in Illinois--was adopted. As stated in Richards

v. Raymond, 92 Ill. 612, 617-18 (1879):

               "[I]t is a part of the history of the State when the

          constitution was framed, that there was a great want of

          uniformity in the course of study prescribed and taught

          in the common schools of the State. In the larger and

          more wealthy counties the free schools were well graded

          and the course of instruction of a high order, while in

          the thinly settled and poorer counties the old district

          system was still retained and the course of instruction

          prescribed was of a lower order."

     In view of all of the foregoing considerations, we agree with

the courts below that disparities in educational funding resulting

from differences in local property wealth do not offend section 1's

efficiency requirement.

                                     B

     The remaining question under section 1 of the education

article pertains to its guarantee of a system of "high quality"

educational institutions and services. There is no dispute as to

the nature of this guarantee in the abstract. Instead, the central

issue is whether the quality of education is capable of or properly

subject to measurement by the courts. Plaintiffs maintain that it

is the courts' duty to construe the constitution and determine

whether school funding legislation conforms with its requirements

and cite a number decisions from other jurisdictions in which

courts have concluded that similar constitutional challenges are

capable of judicial resolution. As explained below, however, we

conclude that questions relating to the quality of education are

solely for the legislative branch to answer.

     Historically, this court has assumed only an exceedingly

limited role in matters relating to public education, recognizing

that educational policy is almost exclusively within the province

of the legislative branch. Section 1 of article VIII of the 1870

Constitution provided that "[t]he general assembly shall provide a

thorough and efficient system of free schools, whereby all children

of this state may receive a good common school education." Ill.

Const. 1870, art. VIII, §1. As discussed earlier, except in matters

relating to school district boundaries, this court consistently

held that questions relating to the efficiency and thoroughness of

the school system were left to the wisdom of the legislative

branch. This principle has likewise been applied with respect to

the efficiency requirement in the 1970 Constitution. See Cronin v.

Lindberg, 66 Ill. 2d 47, 58 (1976) (law reducing state aid to

schools that failed to operate for a school year of a specified

minimum duration was not reviewable under the efficiency

requirement).

     More generally, it has been stated that section 1 of article

VIII of the 1870 Constitution was both "a mandate to the

legislature and a limitation on the exercise of the [legislative]

power. [Citation.] The mandate is to provide a thorough and

efficient system of schools, and the limitations are that they

shall be free to all children of the State and such that all

children may receive a good common school education." People ex

rel. Leighty v. Young, 309 Ill. 27, 33 (1923); see also People ex

rel. Hepfer v. Price, 310 Ill. 66, 73 (1923). Yet, while the

requirement that schools provide a "good common school education"

was explicitly recognized to be a limitation on the legislature's

power to enact public school laws, that limitation was not among

those held generally capable of judicial enforcement. Fiedler v.

Eckfeldt, 335 Ill. 11 (1929), illustrates this subtle but important

point:

          "[Section 1 of article VIII of the 1870 Constitution] was

          a command addressed to the legislature, and it has been

          construed as a limitation also on its power to provide

          for the maintenance by local taxation of free schools of

          a different character from that named in the section. ***

          When we look for the limitations on that power we find

          these two, and these two only, WHICH THE COURTS CAN

          ENFORCE: that the schools shall be free, and that they

          shall be open to all equally. The court has enforced

          these limitations when the occasion requiring the

          enforcement of them arose. [Citations.] There are no

          others TO WHICH THE JUDICIAL POWER EXTENDS." (Emphasis

          added.) Fiedler, 335 Ill. at 23.

     In Richards v. Raymond, 92 Ill. 612 (1879), this court

rejected the claim that a law providing for the establishment of

public high schools exceeded the General Assembly's power to

provide for schools where children may receive "a good common

school education." This court found no basis in the 1870

Constitution for limiting the discretion of the legislature in

determining what a good common school education entails:

          "No definition of a common school is given or specified

          in the constitution, nor does that instrument declare

          what course of studies shall constitute a common school

          education. How can it be said that a high school is

          prohibited by the constitution and not included within

          the definition of a common school? The phrase, `a common

          school education' is one not easily defined. One might

          say that a student instructed in reading, writing,

          geography, English grammar and arithmetic had received a

          common school education, while another who had more

          enlarged notions on the subject might insist that

          history, natural philosophy and algebra should be

          included. It would thus be almost impossible to find two

          persons who would in all respects agree in regard to what

          constituted a common school education.

               ***

               *** [W]hile the constitution has not defined what a

          good common school education is, and has failed to

          prescribe a limit, it is no part of the duty of the

          courts of the State to declare by judicial construction

          what particular branches of study shall constitute a

          common school education. That may be and doubtless is a

          proper question for the determination of the legislature,

          and as a law has been enacted by it which does not appear

          to violate the constitution it is not the province of the

          courts to interfere." Richards, 92 Ill. at 617-18.

     Notwithstanding this jurisprudence, plaintiffs insist that our

present constitution accommodates a more active judicial role in

implementing the constitutional guarantee of an efficient system of

high quality educational institutions and services. In this regard,

plaintiffs stress that while the 1870 Constitution specified that

the General Assembly shall provide a system of public schools, the

1970 Constitution expressly places that duty on the State. In

plaintiffs' view, the change in language signifies that section 1

of the education article is no longer merely a mandate to the

General Assembly, but is a mandate to all three branches of the

State government: the executive branch, the legislative branch and

the judicial branch. Surely, however, this provision does not alter

the roles or expand the powers assigned to the different branches

of government by the constitution. Courts may not legislate in the

field of public education any more than they may legislate in any

other area. In reviewing legislation, the role of the courts is

now, as before, to ensure that the enactment does not exceed

whatever judicially enforceable limitations the constitution places

on the General Assembly's power. Courts are no more capable of

defining "high quality educational institutions and services" under

our present constitution than they were able to define a "good

common school education" under the 1870 Constitution. As the

following exchange during the constitutional convention shows, the

framers of the 1970 Constitution did not intend to formulate any

specific definition of "high quality," nor did they anticipate that

the concept would be defined by the courts:

               "MR. GARRISON: ***

               It is my understanding that the word `quality' is--

          in relation to education--is a much debated concept and

          that there have been commissions which have given a great

          deal of study to it.

               Did the [education] committee come to any definite

          definition or conclusion as to what would constitute

          quality services with respect to education?

               ***

               MR. FOGAL: No, we--the word `quality,' I suppose,

          means different things to different people. We had in

          mind the highest, the most excellent educational system

          possible; leave this up to the determination of the

          legislature and your local districts, and let the

          citizens keep pushing for higher-quality education. We

          didn't attempt to define all of the ramifications of high

          quality." 2 Proceedings 767.

Delegate Kamin, a member of the education committee, added that

"[t]he use of the word `high quality' is a play on the use of the

word `good' which is in the present article." 2 Proceedings 767.

According to delegate Kamin the education committee felt that

"there was not any more specific a definition perhaps for `high

quality' than there was for `good,' but at least `good' is a lower

term; `high quality' is a term which is going in the direction in

which we want to go." 2 Proceedings 767.

     Our constitutional jurisprudence in the field of public

education has been guided by considerations of separation of

powers. In federal courts, the principles of separation of powers

find expression in the so-called "political question" doctrine. See

Baker v. Carr, 369 U.S. 186, 210, 7 L. Ed. 2d 663, 682, 82 S. Ct.

691, 706 (1962) ("The nonjusticiability of a political question is

primarily a function of the separation of powers"). The United

States Supreme Court has stated that, " `[i]n determining whether

a question falls within [the political question] category, the

appropriateness under our system of government of attributing

finality to the action of the political departments AND ALSO THE

LACK OF SATISFACTORY CRITERIA FOR A JUDICIAL DETERMINATION are

dominant considerations.' " (Emphasis added.) Baker, 369 U.S. at

210, 7 L. Ed. 2d at 682, 82 S. Ct. at 706, quoting Coleman v.

Miller, 307 U.S. 433, 454-55, 83 L. Ed. 1385, 1397, 59 S. Ct. 972,

982 (1939).

     In Baker, the Court identified several characteristics of

nonjusticiable political questions, including "a lack of judicially

discoverable and manageable standards for resolving [the question]

or the impossibility of deciding [it] without an initial policy

determination of a kind clearly for nonjudicial discretion." Baker,

369 U.S. at 217, 7 L. Ed. 2d at 686, 82 S. Ct. at 710. What

constitutes a "high quality" education, and how it may best be

provided, cannot be ascertained by any judicially discoverable or

manageable standards. The constitution provides no principled basis

for a judicial definition of high quality. It would be a

transparent conceit to suggest that whatever standards of quality

courts might develop would actually be derived from the

constitution in any meaningful sense. Nor is education a subject

within the judiciary's field of expertise, such that a judicial

role in giving content to the education guarantee might be

warranted. Rather, the question of educational quality is

inherently one of policy involving philosophical and practical

considerations that call for the exercise of legislative and

administrative discretion.

     To hold that the question of educational quality is subject to

judicial determination would largely deprive the members of the

general public of a voice in a matter which is close to the hearts

of all individuals in Illinois. Judicial determination of the type

of education children should receive and how it can best be

provided would depend on the opinions of whatever expert witnesses

the litigants might call to testify and whatever other evidence

they might choose to present. Members of the general public,

however, would be obliged to listen in respectful silence. We

certainly do not mean to trivialize the views of educators, school

administrators and others who have studied the problems which

public schools confront. But nonexperts--students, parents,

employers and others--also have important views and experiences to

contribute which are not easily reckoned through formal judicial

factfinding. In contrast, an open and robust public debate is the

lifeblood of the political process in our system of representative

democracy. Solutions to problems of educational quality should

emerge from a spirited dialogue between the people of the State and

their elected representatives. In delegate Fogal's words,

previously quoted, "let the citizens keep pushing for higher-

quality education." 2 Proceedings 767.

     We are well aware that courts in other jurisdictions have seen

fit to define the contours of a constitutionally guaranteed

education and to establish judicial standards of educational

quality reflecting varying degrees of specificity and deference to

the other branches of government. See, e.g., Campbell County School

District v. State, 907 P.2d 1238, 1265 (Wyo. 1995); Campaign for

Fiscal Equity, Inc. v. State, 86 N.Y. 2d 307, 317-19, 655 N.E.2d

661, 666-76, 631 N.Y.S.2d 565, 570-71 (1995); Claremont School

District v. Governor, 138 N.H. 183, 192, 635 A.2d 1375, 1381

(1993); McDuffy v. Secretary of the Executive Office of Education,

415 Mass. 545, 606, 615 N.E.2d 516, 548 (1993); Tennessee Small

School Systems v. McWherter, 851 S.W.2d 139, 147-48 (Tenn. 1993)

(dicta); Abbott v. Burke, 119 N.J. 287, 303-04, 575 A.2d 359, 367

(1990); Rose v. Council for Better Education, Inc., 790 S.W.2d 186,

208-09 (Ky. 1989); Pauley v. Kelly, 162 W. Va. 672, 705-06, 255

S.E.2d 859, 874 (1979); Seattle School District No. 1 v. State, 90

Wash. 2d 476, 502, 585 P.2d 71, 86-87 (1978); see also Idaho

Schools for Equal Educational Opportunity v. Evans, 123 Idaho 573,

583-84, 850 P.2d 724, 734 (1993) (holding that it was court's duty

to interpret constitutional "thoroughness" requirement, but

adopting standards promulgated by the executive branch); Unified

School District No. 229 v. State, 256 Kan. 232, 275, 885 P.2d 1170,

1186 (1994) (court would not substitute its judgment as to what

type of education was "suitable" within the meaning of the

constitution for the standards developed by the legislature and

state department of education; where all schools were able to meet

those standards, the school finance statute was upheld); McDaniel

v. Thomas, 248 Ga. 632, 633, 643-44, 285 S.E.2d 156, 157, 165

(1981) (while holding that the question of whether financing system

deprived children of constitutionally guaranteed "adequate

education" was justiciable, court would only inquire whether system

met a lower standard of providing a minimum or basic education;

because of the inherent difficulty in establishing a judicially

manageable standard for determining whether or not pupils are being

provided an "adequate education," legislative branch must give

content to the term "adequate"). By and large these courts have

viewed the process of formulating educational standards as merely

an exercise in constitutional interpretation or construction. For

the reasons already stated, we disagree; we will not "under the

guise of constitutional interpretation, presume to lay down

guidelines or ultimatums for [the legislature]." Seattle School

District, 90 Wash. 2d at 579, 585 P.2d at 128 (Rosellini, J.,

dissenting, joined by Hamilton & Hicks, JJ.).

     Rather, we agree with the views of the dissenters in several

of the cases cited above. In Seattle School District, Justice

Rosellini lamented the court's usurpation of the legislative

prerogative in the area of educational policy:

               "I would be surprised to learn that the people of

          this state are willing to turn over to a tribunal against

          which they have little if any recourse, a matter of such

          grave concern to them and upon which they hold so many

          strong, though conflicting views. If their legislators

          pass laws with which they disagree or refuse to act when

          the people think they should, they can make their

          dissatisfaction known at the polls. They can write to

          their representatives or appear before them and let their

          protests be heard. The court, however, is not so easy to

          reach [citation] nor is it so easy to persuade that its

          judgment ought to be revised. A legislature may be a hard

          horse to harness, but it is not quite the stubborn mule

          that a court can be. Most importantly, the court is not

          designed or equipped to make public policy decisions, as

          this case so forcibly demonstrates." Seattle School

          District, 90 Wash. 2d at 563-64, 585 P.2d at 120

          (Rosellini, J., dissenting, joined by Hamilton & Hicks,

          JJ.).

     In Pauley, Justice Neely offered the following views regarding

West Virginia's "thorough and efficient system" requirement which

are germane to our own constitution's efficiency and quality

guarantees:

               " `Thorough and efficient' education apparently does

          not mean in this modern world just advanced mathematics,

          chemistry, physics, foreign languages, competence in

          written and spoken English, and a well-developed

          knowledge of history. Something more in the form of

          vocational training and preparation for life is implied,

          yet whatever it is, it is far too unmanageable a standard

          to be developed in a vacuum devoid of political give and

          take by the logical judicial mind, because inherent in

          any consensus about `thorough and efficient' education is

          a difficult balance between irreconcilable value systems.

          I have my own ideas of what constitutes `thorough and

          efficient' education; nonetheless, I am constitutionally

          constrained not to force them down the throats of other

          equally well-informed persons who have different values

          merely because I am a judge." Pauley, 162 W. Va. at 747,

          255 S.E.2d at 899 (Neely, J., dissenting).

     We conclude that the question of whether the educational

institutions and services in Illinois are "high quality" is outside

the sphere of the judicial function. To the extent plaintiffs'

claim that the system for financing public schools is

unconstitutional rests on perceived deficiencies in the quality of

education in public schools, the claim was properly dismissed. For

the foregoing reasons, we affirm the dismissal of plaintiffs'

claims under the education article of our state constitution.

                                    II

     We next consider whether the alleged disparities in

educational funding and opportunity due to variations in local

property wealth give rise to a cause of action under the equal

protection clause of our state constitution (Ill. Const. 1970, art.

I, §2). This court has recently offered the following description

of the analytical framework for evaluating equal protection claims:

               "The analysis applied by this court in assessing

          equal protection claims is the same under both the United

          States and Illinois Constitutions. [Citation.] The

          guarantee of equal protection requires that the

          government treat similarly situated individuals in a

          similar manner. [Citation.] It does not preclude the

          State from enacting legislation that draws distinctions

          between different categories of people, but it does

          prohibit the government from according different

          treatment to persons who have been placed by statute into

          different classes on the basis of criteria wholly

          unrelated to the purpose of the legislation. [Citation.]

               In reviewing a claim that a statute violates equal

          protection, the court applies different levels of

          scrutiny depending on the nature of the statutory

          classification involved. Classifications based on race or

          national origin or affecting fundamental rights are

          strictly scrutinized. Intermediate scrutiny applies to

          discriminatory classifications based on sex or

          illegitimacy. In all other cases, the court employs only

          a rational basis review." Jacobson v. Department of

          Public Aid, 171 Ill. 2d 314, 322-23 (1996).

Because the present challenge to the school funding scheme does not

involve a classification based on gender or illegitimacy, the

intermediate level of scrutiny does not apply. Accord Board of

Education, Levittown Union Free School District v. Nyquist, 57

N.Y.2d 27, 42-43, 439 N.E.2d 359, 365-66, 453 N.Y.S.2d 643, 649-50

(1982). Moreover, plaintiffs do not argue that the school funding

scheme involves a suspect classification such as race or national

origin. Thus, the applicable standard of review in this case

depends on whether education is a fundamental right. If so, to the

extent that funding disparities can be said to impinge on or

interfere with the right to an education, the system for financing

public schools would be subject to strict scrutiny. On the other

hand, if education is not a fundamental right, the highly

deferential "rational basis" test would apply.

     In San Antonio Independent School District v. Rodriguez, 411

U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973), the United States

Supreme Court rejected a challenge under the equal protection

clause of the United States Constitution (U.S. Const., amend. XIV)

to Texas' system of financing public schools. As in the case at

bar, the challenge in Rodriguez was based upon funding disparities

due to variations in local wealth. The Court determined that

education was not a fundamental right for equal protection purposes

under the United States Constitution, and hence Texas' school

funding scheme was not subject to strict scrutiny. The Court

reasoned that the key to determining whether education is

fundamental "lies in assessing whether there is a right to

education explicitly or implicitly guaranteed by the Constitution."

Rodriguez, 411 U.S. at 33, 36 L. Ed. 2d at 43, 93 S. Ct. at 1297.

The Court observed that education was not explicitly afforded

constitutional protection, and the Court could find no basis for

saying it was implicitly so protected. Rodriguez, 411 U.S. at 35,

36 L. Ed. 2d at 44, 93 S. Ct. at 1297.

     Plaintiffs argue that Rodriguez does not control the

determination of whether education is a fundamental right under our

state constitution. They contend that unlike the United States

Constitution, section 1 of the education article of our state

constitution explicitly guarantees the right to an education. While

our constitution does not expressly speak of a "right" to

education, it may be argued that such a right corresponds to the

constitutional requirement that "[t]he State SHALL provide for an

efficient system of high quality public educational institutions

and services" (emphasis added) (Ill. Const. 1970, art. X, §1). See

Seattle School District No. 1 of King County v. State, 90 Wash. 2d

476, 495, 585 P.2d 71, 91 (1978); but see Idaho Schools for Equal

Educational Opportunity v. Evans, 123 Idaho 573, 581-82, 850 P.2d

724, 732-33 (1993) ("Although the sections of our state

constitution which impose a duty upon the government might be said

to invest a derivative right in those to whom the duty is owed, the

inclusion of those derivative rights in our definition of

fundamental rights would be overly broad"). In any event, this

court has specifically indicated that not every right secured by

our state constitution is "fundamental." Kalodimos v. Village of

Morton Grove, 103 Ill. 2d 483, 509 (1984); accord Illinois Pure

Water Committee, Inc., v Director of Public Health, 104 Ill. 2d

243, 251-52 (1984) (noting absence of authority that sections 1 and

2 of article XI of the 1970 Constitution create a "fundamental"

right to a healthful environment, and declining to subject statutes

affecting the environment to heightened scrutiny). This view is

consistent with decisions from other jurisdictions which have

observed that while the federal government is one of limited or

delegated powers, all powers not delegated to the United States or

prohibited to the states are reserved to the states or to the

people. As such, state constitutions touch upon a range of

subjects, not all of which are fundamental. See Hornbeck v.

Somerset County Board of Education, 295 Md. 597, 642, 458 A.2d 758,

785 (1983) (and cases cited); Fair School Finance Council of

Oklahoma, Inc. v. State, 746 P.2d 1135, 1148-49 (Okla. 1987).

     This court has stated that fundamental rights are "only those

which `lie at the heart of the relationship between the individual

and a republican form of nationally integrated government.' "

Kalodimos, 103 Ill. 2d at 509, quoting People ex rel. Tucker v.

Kotsos, 68 Ill. 2d 88, 97 (1977). Fundamental rights include the

expression of ideas, participation in the political process, travel

among the states and privacy with regard to the most intimate and

personal aspects of one's life. Kotsos, 68 Ill. 2d at 97.

Plaintiffs urge us to add education to this list because of its

relationship with certain of these rights which are at the core of

one's role as a citizen. Plaintiffs contend that an education is

essential to one's ability to lead a productive life and is closely

tied to the basic rights of democracy. Amici amplify the point,

asserting that "[a] sound education *** provides meaning and

substance to other fundamental rights--including the right to

speak, the right to enjoy an occupation of choice and the right to

vote."

     While plaintiffs and amici perceptively characterize the

relationship between education and certain basic aspects of

citizenship, we disagree with their conclusion that this

relationship justifies treating education as itself a fundamental

right for equal protection purposes. Generally speaking, the

fundamental right analysis is concerned with laws that somehow

restrain the exercise of a fundamental right. See Rodriguez, 411

U.S. at 38, 36 L. Ed. 2d at 46, 93 S. Ct. at 1299 ("Each of our

prior cases involved legislation which `deprived,' `infringed,' or

`interfered' with the free exercise of some such fundamental

personal right or liberty"). Recognition that rights of expression

and participation in the political process are fundamental--and

thus safeguarded against unjustified governmental interference--

does not necessarily translate into an affirmative governmental

obligation to enrich each individual's personal capacity or ability

to exercise these rights. In this regard it is significant that

while the framers of the 1970 Constitution recognized the

importance of "the educational development of all persons to the

limits of their capacities," they stopped short of declaring such

educational development to be a "right," choosing instead to

identify it as a "fundamental GOAL." (Emphasis added.)

     In determining that education was not implicitly protected by

the United States Constitution, the Rodriguez Court rejected an

argument similar to the one plaintiffs and amici presently advance:

          "The Court has long afforded zealous protection against

          unjustifiable governmental interference with the

          individual's rights to speak and to vote. Yet we have

          never presumed to possess either the ability or the

          authority to guarantee to the citizenry the most

          EFFECTIVE speech or the most INFORMED electoral choice.

          That these may be desirable goals of a system of freedom

          of expression and of a representative form of government

          is not to be doubted. These are indeed goals to be

          pursued by a people whose thoughts and beliefs are freed

          from governmental interference. But they are not values

          to be implemented by judicial intrusion into otherwise

          legitimate state activities." (Emphasis in original.)

          Rodriguez, 411 U.S. at 36, 36 L. Ed. 2d at 44-45, 93 S.

          Ct. at 1298.

     While education is certainly a vitally important governmental

function (see Fumarolo v. Chicago Board of Education, 142 Ill. 2d

54, 73-74 (1990)), it is not a fundamental individual right for

equal protection purposes, and thus the appropriate standard of

review is the rational basis test. Under the rational basis test,

judicial review of a legislative classification is limited and

generally deferential. Jacobson v. Department of Public Aid, 171

Ill. 2d 314, 323 (1996). The challenged classification need only be

rationally related to a legitimate state goal (People v. Bailey,

167 Ill. 2d 210, 231 (1995)) and if any state of facts can

reasonably be conceived to justify the classification, it must be

upheld (Jacobson, 171 Ill. 2d at 324).

     The rationality of Illinois' school funding scheme is best

gauged in light of the basic philosophical considerations that have

defined the policy debate in the area of public education finance.

As noted in Rodriguez:

               " `The history of education since the industrial

          revolution shows a continual struggle between two forces:

          the desire by members of society to have educational

          opportunity for all children, and the desire of each

          family to provide the best education it can afford for

          its own children.' " Rodriguez, 411 U.S. at 49, 36 L. Ed.

          2d at 52, 93 S. Ct. at 1305, quoting J. Coleman, Foreword

          to G. Strayer & R. Haig, The Financing of Education in

          the State of New York vii (1923).

     Similarly, one commentator has observed:

          "The character of a public education system can be

          evaluated in terms of three often competing principles:

          quality, equality, and liberty. The quality of a school

          system is high when good educational opportunities are

          available to the least advantaged children in the state.

          In a school system featuring a high degree of equality

          every student has access to the same educational

          resources as any other student. Liberty is enhanced when

          localities or families have the autonomy to determine

          what proportion of their resources they wish to devote to

          the education of their youth.

               *** A guarantee of equal educational funding does

          not secure any particular level of quality. It does

          ensure a high level of equality and a low level of

          liberty. Liberty is curtailed because equalization of

          educational funding requires redistribution of resources

          from wealthy districts to poor ones, which can only be

          achieved through greater centralization of control over

          the public schools. Centralization reduces the freedom of

          localities and families to choose their own levels of

          educational spending." R. Stark, Education Reform:

          Judicial Interpretation of State Constitutions' Education

          Finance Provisions--Adequacy vs. Equality, 1991 Annual

          Survey of American Law 609, 665-66.

     The concept of "local control" in public education connotes

not only the opportunity for local participation in decisionmaking

but also "the freedom to devote more money to the education of

one's children." Rodriguez, 411 U.S. at 49-50, 36 L. Ed. 2d at 52,

93 S. Ct. at 1304-05; see also Lujan v. Colorado State Board of

Education, 649 P.2d 1005, 1023 (Colo. 1982) ("[local] control is

exercised by influencing the determination of how much money should

be raised for local schools, and how that money should be spent").

As noted earlier, several members of the education committee of the

Sixth Constitutional Convention voiced strong support for the

preservation of local control. They felt that community members

would be less enthusiastic in their efforts to improve public

education if limits were placed on community decisions to support

local schools with local resources for the sake of equalizing

resources statewide.

     The general structure of the State's system of funding public

schools through State and local resources--and the particular

amounts allocated for distribution as general state aid--represent

legislative efforts to strike a balance between the competing

considerations of educational equality and local control. Certainly

reasonable people might differ as to which consideration should be

dominant. However, the highly deferential rational basis test does

not permit us to substitute our judgment in this regard for that of

the General Assembly, and we have no basis to conclude that the

manner in which the General Assembly has struck the balance between

equality and local control is so irrational as to offend the

guarantee of equal protection. We also note that although reliance

on local wealth to fund public education produces variations in

resources which do not necessarily correspond to differences in

educational need, the same may be said for a variety of important

governmental services, such as police and fire protection, which

have traditionally been funded at the local level. See Rodriguez,

411 U.S. at 53-54, 36 L. Ed. 2d at 54-55, 93 S. Ct. at 1307.

Consequently, the logical implications of declaring Illinois'

system of financing public education to be "irrational" might be

far reaching indeed. While the present school funding scheme might

be thought unwise, undesirable or unenlightened from the standpoint

of contemporary notions of social justice, these objections must be

presented to the General Assembly.

     While some decisions in other jurisdictions have concluded

that there is no rational basis for funding disparities based on

local wealth (see, e.g., Tennessee Small School Systems v.

McWherter, 851 S.W.2d 139, 153-56 (Tenn. 1993); Dupree v. Alma

School District No. 30, 279 Ark. 340, 345, 651 S.W.2d 90, 93

(1983)), financing schemes similar to ours have been upheld by a

majority of those courts that have applied the rational basis

standard (see, e.g., City of Pawtucket v. Sundlun, 662 A.2d 40, 62

(R.I. 1995); Kukor v. Grover, 148 Wis. 2d 469, 497-510, 436 N.W.2d

568, 580-85 (1989); Fair School Finance Council of Oklahoma, Inc.

v. State, 746 P.2d 1135, 1150 (Okla. 1987); Hornbeck v. Somerset

County Board of Education, 295 Md. 597, 651, 458 A.2d 758, 788-90

(1983); Board of Education, Levittown Union Free School District v.

Nyquist, 57 N.Y. 2d 27, 43-46, 439 N.E.2d 359, 366-68, 453 N.Y.S.2d

643, 650-52 (1982); Lujan v. Colorado State Board of Education, 649

P.2d 1005, 1022-23 (Colo. 1982); McDaniel v. Thomas, 248 Ga. 632,

648, 285 S.E.2d 156, 167-68 (1981); Board of Education v. Walter,

58 Ohio St. 2d 368, 377, 390 N.E.2d 813, 820 (1979); Thompson v.

Engelking, 537 P.2d 635, 645 (Idaho 1975)). In accordance with

Rodriguez and the majority of state court decisions, and for all

the reasons set forth above, we conclude that the State's system of

funding public education is rationally related to the legitimate

State goal of promoting local control. Plaintiffs' claims under the

equal protection clause of Illinois Constitution were properly

dismissed.

                                CONCLUSION

     In closing, it bears emphasis that our decision in no way

represents an endorsement of the present system of financing public

schools in Illinois, nor do we mean to discourage plaintiffs'

efforts to reform the system. However, for the reasons explained

above, the process of reform must be undertaken in a legislative

forum rather than in the courts. Plaintiffs' complaint was properly

dismissed, and we therefore affirm the judgment of the appellate

court.

Affirmed.

                                                                         

     JUSTICE HARRISON took no part in the consideration or decision

of this case.

     JUSTICE FREEMAN, concurring in part and dissenting in part:

     I agree with the majority that count I of plaintiffs'

complaint does not state a cause of action under the equal protec-

tion clause of the 1970 Illinois Constitution (Ill. Const. 1970,

art. I, §2). Accordingly, I concur in that part of the majority

opinion that upholds the trial court's dismissal of that count.

Slip op. at 24-32.

     However, the majority also concludes that count III of the

complaint does not state a cause of action under the education

article of the 1970 Illinois Constitution (Ill. Const. 1970, art.

X, §1). I respectfully disagree. I conclude that count III does

state a cause of action under the education article. Accordingly,

I dissent from that part of the majority opinion that upholds the

trial court's dismissal of that count. Slip op. at 5-24.

                                BACKGROUND

     This case comes to this court on a motion to dismiss. 735 ILCS

5/2--615 (West 1994). Therefore, we must determine whether

plaintiffs' second-amended complaint, when viewed in the light most

favorable to plaintiffs, alleges sufficient facts to establish a

cause of action on which relief may be granted. We must take as

true all well-pled facts in the complaint and construe all

reasonable inferences in favor of plaintiffs. See Ziemba v.

Mierzwa, 142 Ill. 2d 42, 46-47 (1991); Meerbrey v. Marshall Field

& Co., 139 Ill. 2d 455, 473 (1990).

     The majority describes the gist of plaintiffs' detailed

second-amended complaint. Slip op. at 3-5. Plaintiffs allege the

following. The Illinois public school funding scheme creates vast

disparities in educational resources and opportunity among Illinois

school districts. The complaint quotes from the 1989 School Report

Card, published by the Illinois State Board of Education, which

stated as follows. Rich school districts employed a greater

percentage of teachers with advanced degrees than poor districts.

Rich school districts paid their teachers considerably higher

salaries than poor districts. Also, more money was spent to educate

students in rich school districts than in poor districts. In

contrast, poor school districts, with significantly higher

proportions of students from low-income families, had considerably

fewer resources to help educate their children than rich districts.

     I recount some of the complaint's specific allegations to show

clearly the factual basis of this lawsuit. For example, a poor

school district reported that "it replaces its worn-out desks by

retrieving from a dumpster perfectly functional desks thrown away

by a neighboring school district."

     The complaint offers two neighboring school districts as "a

concrete example of the consequences of differences in local

property wealth." Byron Community Unit School District No. 226 and

Mount Morris Community Unit School District No. 261 are located in

Ogle County, which lies in north central Illinois. Based on their

respective property tax bases, schools in the Byron district

receive significantly greater funding than schools in the Mount

Morris district. "As a result of these large differences in school

funding in the two districts, the children of Byron have far

greater educational opportunity than the children of Mount Morris,

with far less tax effort."

     For example, Byron offers a starting salary for new teachers

of $22,800 per year; Mount Morris can afford to offer only $16,000.

Byron High School offers 187 courses; Mount Morris' high school

offers only 113. Byron uses relatively new and current textbooks;

Mount Morris uses textbooks that are 15 to 20 years old. Physical

facilities at Byron are new and in good condition; Mount Morris

lacks funds to remedy a $900,000 asbestos problem, repair leaky

roofs, and replace flammable stage curtains and rotting football

field bleachers.

     Further, the disparities in educational resources and

opportunity among Illinois school districts are some of the most

severe in the nation. The complaint quotes from the 1989 Annual

Report of the Illinois State Board of Education, which acknowledged

that Illinois ranks sixth in the nation in educational funding

disparities.

                                DISCUSSION

     I note at the outset some general principles that the majority

recognizes. Slip op. at 7-8. A court presumes legislation to be

constitutional. Based on this presumption, the party challenging

particular legislation has the burden of clearly establishing the

alleged constitutional violation. Nevitt v. Langfelder, 157 Ill. 2d

116, 124 (1993); People v. Shephard, 152 Ill. 2d 489, 499 (1992).

     The meaning of a constitutional provision depends on the

common understanding of the citizens who gave the constitution life

by ratifying it. This understanding is best determined by referring

to the common meaning of the words used (League of Women Voters v.

County of Peoria, 121 Ill. 2d 236, 243 (1987)), unless it is

clearly evident that a contrary meaning was intended. Coalition for

Political Honesty v. State Board of Elections, 65 Ill. 2d 453, 464

(1976). Where the text of the constitution is clear and

unambiguous, the constitutional convention debates can have no

bearing or effect on its interpretation. Nevitt, 157 Ill. 2d at

134; People ex rel. Watseka Telephone Co. v. Emmerson, 302 Ill.

300, 311 (1922).

     If ambiguities remain after consulting the language of the

provision, it is then appropriate to consult the convention debates

to ascertain the meaning that the delegates attached to the provi-

sion. This is so because it is only with the consent of the

convention that the provision was submitted to the voters in the

first place. League of Women Voters, 121 Ill. 2d at 243-44. Also,

"[i]n construing the meaning of a constitutional provision, it is

appropriate and helpful to examine it in light of the history and

condition of the times, and the particular problem which the

convention sought to address by incorporating in the document the

questioned provision." Client Follow-Up Co. v. Hynes, 75 Ill. 2d

208, 216 (1979).

                        Illinois Education Article

     Plaintiffs contend, inter alia, that the public school funding

scheme violates section 1 of the education article of the 1970

Illinois Constitution:

          "§1. Goal--Free Schools

               A fundamental goal of the People of the State is the

          educational development of all persons to the limits of

          their capacities.

               The State shall provide for an efficient system of

          high quality public educational institutions and

          services. Education in public schools through the second-

          ary level shall be free. There may be such other free

          education as the General Assembly provides by law.

               The State has the primary responsibility for

          financing the system of public education." (Emphasis

          added.) Ill. Const. 1970, art. X, §1.

     Plaintiffs focus on the first sentence of the second paragraph

(hereafter the education system provision). Plaintiffs allege,

inter alia, that the education system provision requires the state

to provide an education system that is "efficient" and "high

quality." Plaintiffs allege that the Illinois public school funding

scheme creates significant and growing disparities in educational

services and resources throughout the state. According to

plaintiffs, "[a]n educational funding system is not an `efficient

system' when some children have vast educational resources and

others minimal. An education funding system is not a `system of

high quality' schools where only some children can go to them."

     While I agree with plaintiffs' characterization of the

"efficiency" aspect of the education system provision, I hereafter

focus my remarks on its "high quality" aspect. Plaintiffs argue

that the state provides an educational system in which students in

poor school districts are relegated to an educational opportunity

that is devoid of high quality and is dramatically inferior to that

offered in rich school districts. Plaintiffs claim that these

disparities are so severe that the state fails to provide children

in poor school districts "an efficient system of high quality

public educational institutions and services."

                               Jurisdiction

     I initially address the issue of whether count III presents a

justiciable issue, or whether it raises a nonjusticiable political

question over which a court lacks subject-matter jurisdiction. When

the parties seek adjudication of only a political question, they do

not present a court with a justiciable controversy. Flast v. Cohen,

392 U.S. 83, 95, 20 L. Ed. 2d 947, 959, 88 S. Ct. 1942, 1950

(1968). Absent a justiciable controversy, a court lacks subject-

matter jurisdiction. People v. Capitol News, Inc., 137 Ill. 2d 162,

170 (1990). Agreeing with the State, the majority declares that the

high quality aspect of the education system provision is not

judicially enforceable. Slip op. at 17-24.

     I respectfully disagree. The following principles are

fundamental:

               "Under traditional constitutional theory, the basic

          `sovereign' power of the state resides in the

          legislature. From this it follows, again in theory, that

          there is no need to grant any power to the legislature.

          All that need be done is to place such limitations as are

          desired on the legislature's otherwise unlimited power."

          G. Braden & R. Cohn, The Illinois Constitution: An

          Annotated and Comparative Analysis 111 (1969), cited in

          Client Follow-Up, 75 Ill. 2d at 215.

Accordingly:

          "limitations written into the Constitution are

          restrictions on legislative power and are enforceable by

          the courts. On the other hand, constitutional directives

          to the legislature are considered as mandates or commands

          to the legislature to act, and it is generally held that

          the courts are powerless to enforce them." Client Follow-

          Up, 75 Ill. 2d at 215.

     To determine the judicial enforceability of the education

system provision, I first review section 1 of the education article

of the 1870 Illinois Constitution, which stated:

               "The general assembly shall provide a thorough and

          efficient system of free schools, whereby all children of

          this state may receive a good common school education."

          (Emphasis added.) Ill. Const. 1870, art. VIII, §1.

     Applying traditional constitutional theory to this section,

this court consistently held that this section was a mandate to the

legislature, requiring it to provide a thorough and efficient

system of free schools. The same section was held also to limit the

power of the legislature, in that the section limited the purpose

of the system of free schools to that of providing a good education

to all the children of the state. People ex rel. Hepfer v. Price,

310 Ill. 66, 73 (1923); People ex rel. Goodell v. Chicago &

Northwestern Ry. Co., 286 Ill. 384, 390 (1918).

     This court concluded that section 1 of the 1870 Constitution's

education article imposed only two judicially enforceable

limitations on the legislature: that the schools were free, and

that they were open to all without discrimination. People v.

Deatherage, 401 Ill. 25, 30 (1948); Fiedler v. Eckfeldt, 335 Ill.

11, 23 (1929). However, the question of the efficiency and fairness

of the school system was solely for the legislature to answer.

McLain v. Phelps, 409 Ill. 393, 398 (1951); Deatherage, 401 Ill. at

31.

     This court expressly based this conclusion on the plain

language of section 1 of the 1870 Constitution's education article,

which commanded the legislature specifically. In Fiedler, 335 Ill.

at 23-24, this court cited examples from other constitutional

directives in the 1870 Constitution that were addressed

specifically either to the General Assembly or to the Governor.

Referring to section 1 of the 1870 Constitution's education

article, the Fiedler court explained:

               "The command of the constitution is addressed to the

          General Assembly alone. It was not a self-executing

          provision but required legislation to give it effect, and

          the responsibility and duty of providing the system and

          the means and agencies by which it should be made

          effective rest upon the General Assembly alone."

          (Emphasis added.) Fiedler, 335 Ill. at 23.

     In contrast, the education system provision in the 1970

Illinois Constitution is expressly addressed to the "State"

generally, as opposed to section 1 of the 1870 Constitution's

education article, which was addressed to the "general assembly"

specifically. I conclude that the education system provision in the

1970 Illinois Constitution is not a command addressed solely to the

legislature, as was section 1 of the education article of the 1870

Constitution. Rather, the education system provision is a

constitutional directive to the three branches of state government

to fulfill their duties in accordance with their traditional roles

under separation of powers principles. I base my conclusion on the

plain language of the 1970 Constitution's education article, which

is supported by the record of the constitutional convention.

     Initially, the plain language of the 1970 Illinois

Constitution's education article shows that the education system

provision is addressed to the entire state government and not

solely to the legislature. I earlier quoted section 1 of the

current education article. The first paragraph of section 1 refers

to education as a fundamental goal of "the People of the State."

The sovereign power of the entire state government resides in the

people of the state, who are vested with ultimate sovereignty. In

other words, the people of the state are "the source of all

governmental power--not only all legislative power but all

executive power and all judicial power." People ex rel. Thomson v.

Barnett, 344 Ill. 62, 65 (1931); accord Dodge v. Cole, 97 Ill. 338,

355 (1881); 81A C.J.S. States §35 (1977); 1 T. Cooley,

Constitutional Limitations 81, 84 (8th ed. 1927).

     It is correct and traditional to speak of the complete or

unlimited power of the legislature, absent constitutional

limitations. See, e.g., Client Follow-Up, 75 Ill. 2d at 215; Locust

Grove Cemetery Ass'n v. Rose, 16 Ill. 2d 132, 138 (1959);

Greenfield v. Russel, 292 Ill. 392, 399 (1920); Harris v. Board of

Supervisors, 105 Ill. 445, 450 (1882). However, it must be remem-

bered that the people of the state, as the ultimate sovereign,

vested such power in the legislature in the first place. Barnett,

344 Ill. at 66; Hawthorn v. People, 109 Ill. 302, 306 (1883);

accord 72 Am. Jur. 2d States, Territories, and Dependencies §41, at

440 (1974); 1 T. Cooley, Constitutional Limitations 175-77 (8th ed.

1927). Thus, I read the first paragraph of section 1 of the

education article to declare that education is a fundamental goal

of the entire state government.

     The education system provision immediately follows, addressed

simply to "The State." Why would the framers of the 1970 Illinois

Constitution use the words "The State" if they intended to refer

solely to the General Assembly, as the 1870 Constitution had

expressly done? If "the State" were read as referring solely to the

legislature, those plain words would be rendered superfluous.

However, courts do not presume the existence of surplusage in

constitutional or statutory construction. The rule of construction

that each word, clause, or sentence must be given some reasonable

meaning, if possible, applies especially to constitutional

interpretation. Coalition for Political Honesty, 65 Ill. 2d at 466

(and cases cited therein). The efficient system requirement, ad-

dressed to "The State," plainly refers to the preceding "People of

the State," which, as I explained, refers to the entire state

government.

     I also note that the last sentence in the second paragraph of

the education article refers specifically to the "General Assem-

bly." Thus, if the framers of the 1970 Illinois Constitution had

intended the education system provision to command the legislature

alone, they could have named the legislature specifically.

     My analysis of the education system provision, based on the

plain language of the education article, should properly end here.

See Nevitt, 157 Ill. 2d at 134. However, the State contends that

the convention record reveals the opposite conclusion.

     I disagree. The plain language of the education article is

supported by the record of the constitutional convention. The

Education Committee originally drafted the education system

provision to read: "To achieve this goal [educational development

as the `paramount goal' of the people of the State], it shall be

the duty of the State to provide for an efficient system of high

quality public educational institutions and services." (Emphasis

added.) 6 Record of Proceedings, Sixth Illinois Constitutional

Convention 227, Committee Proposal No. 1 (hereinafter cited as

Proceedings).

     In presenting Committee Proposal No. 1 to the convention,

committee member Samuel Patch repeatedly referred to the education

system provision as a mandate to the "state." 2 Proceedings 764-65.

Further, in response to questions on the proposal, Patch

specifically said that the "state" was mandated "to carry out this

goal--therefore, we said the whole state, that is, the executive

branch as well as the General Assembly." (Emphasis added.) 2

Proceedings 766.

     At the end of the debate, the phrase "the paramount goal" was

replaced with the phrase "a fundamental goal." 2 Proceedings 802-

03. The proposed education article was sent to the Style, Drafting

and Submission Committee (hereafter Style Committee). The Style

Committee then modified the proposed education article as shown in

pertinent part, with deleted language in brackets and added

language underlined:

               "A fundamental goal of the People of the State

          [shall be] is the educational development of all persons

          to the limits of their capacities.

               [To achieve this goal, it shall be the duty of] The

          State shall [to] provide for an efficient system of high

          quality public educational institutions and services." 6

          Proceedings 331 (Style Committee Proposal No. 11).

     On the convention floor, delegates questioned the Style

Committee chairman on whether the deletions to the education system

provision, as originally drafted, changed the meaning of the

sentence. 5 Proceedings 4120. The chairman answered:

          "We didn't work a substantive change in it. If anything,

          I think we reaffirmed in a stronger manner by sentence 2,

          the intent of the [convention] on first reading.

               Furthermore, sentence 2 follows sentence 1; the two

          are definitely interrelated. I don't think reasonable

          people would differ about that ***." 5 Proceedings 4121.

Thus, both the plain language of the education article and the

convention record show that the education system provision is

addressed to the entire state government and not solely to the

legislature.

     The State contends that the record of the constitutional

convention clearly expresses the obvious intent of the framers that

the education system provision is addressed solely to the

legislature. The State cites several examples from the convention

record.

     The Education Committee originally drafted the first section,

first paragraph of the education article to declare that education

is the "paramount" goal of the people of the state. 6 Proceedings

227 (Committee Proposal No. 1). The State points to the many

delegates who expressed their concern that such a constitutional

commitment would remove legislative flexibility in addressing other

important matters. 2 Proceedings 769, 793, 798-802.

     The State also points to the Education Committee's written

explanation of the education system provision. The committee

described it as a mandate. The committee noted that Illinois courts

already used the concept of efficiency as a guide in validating

school district boundary changes. The committee believed that it

would be useful to continue this concept of efficiency and to add

to it the idea of high quality. 6 Proceedings 234, Committee

Proposal No. 1. During questioning on the convention floor,

committee member Patch explained that the committee intended to

reincorporate and maintain the continuity of case law on efficiency

in the context of school district boundaries. 2 Proceedings 766.

The State argues that this explanation clearly shows the obvious

intent of the framers to continue this court's interpretation of

section 1 of the education article of the 1870 Constitution as

judicially nonenforceable.

     The State also points to the Education Committee's Proposal

No. 2, which provided that "substantially all funds for the

operational costs of the free public schools shall be appropriated

by the General Assembly for the benefit of the local school

districts," and which limited local school taxes to 10% of the

amount that a school district received from the legislature. 6

Proceedings 295, Committee Proposal No. 2. In Blase v. State, 55

Ill. 2d 94, 98-100 (1973), this court recounted the debate on this

proposal and how it ultimately resulted in the third paragraph of

section 1 of the education article. Based on the convention record,

this court held that the paragraph was merely hortatory and did not

impose a specific, legally enforceable funding obligation on the

General Assembly.

     These references to the constitutional convention record do

not constitute such a clear expression of an obvious intent of the

framers as to allow this court to ignore the unambiguous constitu-

tional language. Of course, the convention delegates were sensitive

to the need for legislative flexibility. The delegates did not

intend to constitutionally mandate any particular public school

funding scheme. They also wanted to maintain the continuity of case

law on efficiency in the context of school district boundaries.

     Nevertheless, the plain language of the education article,

additionally supported by the convention record, shows that the

education system provision is not limited to the legislature, as

was section 1 of the education article of the 1870 Constitution.

Rather, the education system provision is a restriction that is

directed at the entire state government.

     The entire state government consists not only of the executive

and legislative departments, as Delegate Patch stated (2

Proceedings 766), but also the judicial department. People v.

Commonwealth Edison Co., 367 Ill. 260, 273 (1937); Devine v.

Brunswick-Balke-Collender Co., 270 Ill. 504, 509 (1915); Dodge, 97

Ill. at 355.

     Neither the plain language of the education article of the

1970 Illinois Constitution nor the convention record indicates that

the framers intended to strip from the courts the power to

determine whether the education system provision has been violated.

Since the education system provision is addressed to the entire

state government, and since the judiciary is a coordinate branch of

state government, I would hold that the education system provision

is judicially enforceable.

     I acknowledge that this court reached a contrary conclusion in

Cronin v. Lindberg, 66 Ill. 2d 47, 58 (1976). The court in Cronin

mechanically applied this court's interpretation of the 1870

Constitution's education article to the education system provision

of the 1970 Illinois Constitution. See also Polich v. Chicago

School Finance Authority, 79 Ill. 2d 188, 203-04 (1980); Board of

Education, School District No. 150 v. Cronin, 51 Ill. App. 3d 838,

841-42 (1977). Such an application is erroneous. I would reverse

Cronin on this point.

     The majority concludes that the plain language of the

education system provision, additionally supported by the

convention record, "does not alter the roles or expand the powers

assigned to the different branches of government by the

constitution." Slip op. at 19. I agree that it does not. However,

as I have explained, where section 1 of the education article of

the 1870 Illinois Constitution excluded the judicial and executive

departments, the education system provision in the 1970 Constitu-

tion embraces all three branches of state government, including the

judiciary. This court stated long ago:

          "To the judiciary is confided the power and the duty of

          interpreting the laws and the constitution whenever they

          are judicially presented for consideration. Hence it

          becomes our duty to determine what is the meaning of the

          laws passed by the legislature, and, also, whether those

          laws are such as the legislature was authorized by the

          constitution to pass." People ex rel. Billings v.

          Bissell, 19 Ill. 229, 231 (1857).

Accord Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177-78, 2 L. Ed.

60, 73-74 (1803).

     Indeed, the judicial role of construing the constitution and

determining if it has been violated is essential to our form of

government. Accordingly, as the highest court of this state, it is

the function and duty of the supreme court to act as the final

arbiter of the Illinois Constitution. People ex rel. Harrod v.

Illinois Courts Comm'n, 69 Ill. 2d 445, 458 (1977) (and cases cited

therein); Billings, 19 Ill. at 232; accord United States v. Nixon,

418 U.S. 683, 704-05, 41 L. Ed. 2d 1039, 1062, 94 S. Ct. 3090, 3106

(1974).

     The majority fears "legislating" in the field of public

education. Slip op. at 19-20. The majority concludes that the issue

of disparities in educational services and resources among school

districts is a political question and, thus, nonjusticiable. Slip

op. at 20-22. Indeed, the majority would deny the judicial

department of state government jurisdiction over this issue even if

the judiciary gave great deference to the legislative and executive

departments in defining and regulating educational quality. Slip

op. at 22-23.

     Out of fear of entering a "political thicket" (see Colegrove

v. Green, 328 U.S. 549, 556, 90 L. Ed. 1432, 1436, 66 S. Ct. 1198,

1201 (1946)), the majority completely abdicates its constitutional

duty to interpret the Illinois Constitution. The doctrine at issue

here "is one of `political questions,' not one of `political

cases.' The courts cannot reject as `no law suit' a bona fide

controversy as to whether some action denominated `political'

exceeds constitutional authority." Baker v. Carr, 369 U.S. 186,

217, 7 L. Ed. 2d 663, 686, 82 S. Ct. 691, 710 (1962).

     Of course, courts cannot exercise legislative powers or compel

their proper action. Donovan v. Holzman, 8 Ill. 2d 87, 93 (1956);

People ex rel. Huempfner v. Benson, 294 Ill. 236, 239 (1920).

However, "the judiciary has always had the right and duty to review

all legislative acts in the light of the provisions and limitations

of our basic charter. The mere fact that political rights and

questions are involved does not create immunity from judicial

review." Donovan, 8 Ill. 2d at 93; accord Powell v. McCormack, 395

U.S. 486, 549, 23 L. Ed. 2d 491, 532, 89 S. Ct. 1944, 1978 (1969).

This court has not hesitated to invalidate long-standing practices

under statutes that offend the Illinois Constitution. Wolfson v.

Avery, 6 Ill. 2d 78, 95 (1955). It is the duty of the judiciary "to

interpret laws and protect the rights of individuals against acts

beyond the scope of legislative power." Benson, 294 Ill. at 239.

     The best example of a "political case" is one involving

legislative apportionment. The 1970 Illinois Constitution confers

upon the supreme court original and exclusive jurisdiction over

actions concerning redistricting the state legislature. Ill. Const.

1970, art. IV, §3(b). The constitutional function of the supreme

court "is to review what has been done by the body charged with

that responsibility to determine if it has comported itself and

discharged its responsibility in a lawful, legal manner. If it is

determined that such has been done, that is the end of the matter."

People ex rel. Burris v. Ryan, 147 Ill. 2d 270, 301 (1991) (Heiple,

J., concurring).

     In apportionment, this court's "historic function does not

give us the right to indirectly exercise the legislative function

by striking down a redistricting merely because we conceive that it

might have been done better. The complicated considerations

involved require careful study and a weighing of factors." Donovan,

8 Ill. 2d at 93. Rather, this court's role is limited solely to

determining whether or not the legislature complied with the

constitution:

               "The drawing of a reapportionment map is essentially

          a political and not a judicial process. It becomes

          judicial only if the parties who have the responsibility

          of drawing a map violate the law and produce a legally

          unacceptable map. A map that is politically unacceptable

          to one political party is not, for that reason, legally

          unacceptable. The courts must necessarily extend latitude

          to the political and governmental authorities in

          discharging their duties. Otherwise, the courts would

          become a political rather than a judicial institution."

          (Emphasis in original.) Burris, 147 Ill. 2d at 302

          (Heiple, J., concurring).

Although this court is appropriately sensitive to its limited role,

it has never abandoned its constitutional function to determine

solely whether or not the legislature has complied with the

constitution. Donovan, 8 Ill. 2d at 93; People ex rel. Woodyatt v.

Thompson, 155 Ill. 451, 462, 480 (1895).

     As with a reapportionment map, I believe that the judiciary

cannot strike down the Illinois public school funding scheme merely

because it might have been done better. However, it is the

constitutional function of this court to determine solely whether

or not the Illinois public school funding scheme comports with the

education system provision.

     Giving great deference to the legislative and executive

departments of state government, I believe that the education

system provision establishes a constitutional floor regarding

educational adequacy. That provision imposes a constitutional

responsibility on the entire state government. It is the duty of

the judicial department to adjudicate the nature of that responsi-

bility. See Campaign for Fiscal Equity, Inc. v. State, 86 N.Y.2d

307, 315, 655 N.E.2d 661, 665, 631 N.Y.S.2d 565, 569 (1995).

     Despite the stark disparities in educational resources and

opportunity alleged in this record, the majority concludes that the

subject of educational quality is so important that only the

political departments of state government, and not the judiciary,

may play a role in outlining its parameters. Slip op. at 21-22. I

believe, however, that education is too precious a commodity for

the judiciary to permit such a constitutional violation.

     A public school education is not "merely some governmental

`benefit' indistinguishable from other forms of social welfare

legislation." Plyler v. Doe, 457 U.S. 202, 221, 72 L. Ed. 2d 786,

801, 102 S. Ct. 2382, 2396 (1982). Courts have repeatedly

recognized that a public school education is vital in two ways.

First, it prepares individuals for participation as citizens; its

deprivation has a lasting impact on the life of the child. Second,

it maintains our basic institutions and, indeed, preserves the

values on which our society rests. Plyler, 457 U.S. at 221, 72 L.

Ed. 2d at 801, 102 S. Ct. at 2396-97; Ambach v. Norwick, 441 U.S.

68, 76-78, 60 L. Ed. 2d 49, 56-57, 99 S. Ct. 1589, 1594-95 (1979)

(and authorities cited therein).

     Regarding the importance of a public school education on the

individual citizen, the following has been recognized:

               " `Today, education is perhaps the most important

          function of state and local governments. Compulsory

          school attendance laws and the great expenditures for

          education both demonstrate our recognition of the

          importance of education to our democratic society. It is

          required in the performance of our most basic public

          responsibilities, even service in the armed forces. It is

          the very foundation of good citizenship. Today it is a

          principal instrument in awakening the child to cultural

          values, in preparing him for later professional training,

          and in helping him to adjust normally to his environment.

          In these days, it is doubtful that any child may

          reasonably be expected to succeed in life if he is denied

          the opportunity of an education. Such an opportunity,

          where the state has undertaken to provide it, is a right

          which must be made available to all on equal terms.' "

          Plyler, 457 U.S. at 222-23, 72 L. Ed. 2d at 803, 102 S.

          Ct. at 2397-98, quoting Brown v. Board of Education, 347

          U.S. 483, 493, 98 L. Ed. 873, 880, 74 S. Ct. 686, 691

          (1954).

     Education also plays a "pivotal role *** in sustaining our

political and cultural heritage" (Plyler, 457 U.S. at 221, 72 L.

Ed. 2d at 802, 102 S. Ct. at 2397):

          "The `American people have always regarded education and

          [the] acquisition of knowledge as matters of supreme

          importance.' [Citation.] We have recognized `the public

          schools as a most vital civic institution for the

          preservation of a democratic system of government,'

          [citation] and as the primary vehicle for transmitting

          `the values on which our society rests.' [Citation.]

          `[S]ome degree of education is necessary to prepare

          citizens to participate effectively and intelligently in

          our open political system if we are to preserve freedom

          and independence.' [Citation.] `*** In addition,

          education provides the basic tools by which individuals

          might lead economically productive lives to the benefit

          of us all. In sum, education has a fundamental role in

          maintaining the fabric of our society. We cannot ignore

          the significant social costs borne by our Nation when

          select groups are denied the means to absorb the values

          and skills upon which our social order rests." Plyler,

          457 U.S. at 221, 72 L. Ed. 2d at 801-02, 102 S. Ct. at

          2397.

     Despite the inestimable value of a public school education,

the majority forever forecloses any judicial inquiry into whether

the legislative and executive departments of our state government

conform to the education system provision. Regardless of how

abysmal educational resources and opportunity become in poor school

districts, and how severe the disparities in educational quality

grow among school districts, the judiciary is now powerless to

enforce the constitution. I would hold that count III of

plaintiffs' complaint presents a justiciable issue.

                         Sufficiency of Count III

     The appellate court read plaintiffs' complaint as demanding

equal educational resources and services among all school

districts, and the same instruction in all schools. 267 Ill. App.

3d at 21-22.

     However, it is important to identify what plaintiffs allege.

Plaintiffs do not allege that the education system provision

mandates equal funding among all school districts, or uniform

instruction in all schools. Rather, plaintiffs contend that the

state cannot provide a high quality education to some students, but

not to others. Plaintiffs allege that the Illinois public school

funding scheme creates significant disparities between the richest

and poorest school districts in the quality of educational

resources and services provided. Plaintiffs further allege that,

due to these disparities, the state fails to provide students in

poor school districts "an efficient system of high quality public

educational institutions and services." Ill. Const. 1970, art. X,

§1.

     To the appellate court, plaintiffs' complaint did not allege

"that plaintiffs are being denied a minimally adequate education."

The court read the complaint as resting "not on the adequacy of

education in a district, but on differences in benefits and

opportunities offered from district to district." 267 Ill. App. 3d

at 21.

     However, plaintiffs' complaint clearly alleges that the

disparities between rich and poor school districts cause children

in poor school districts to receive an inferior education.

Plaintiffs allege that educational resources and services in poor

school districts are inferior not only in comparison to those

provided in rich school districts, but are intrinsically so

inferior and inadequate as to harm "[e]ach of the plaintiff school

districts and each of the plaintiff schoolchildren" and to violate

the education system provision.

     Further, the appellate court appears to have rejected

plaintiffs' underlying correlation between educational resources

and services and educational quality. The court concluded:

          "To allege that certain educational resources are

          unavailable in poorer school districts, or inferior to

          those in wealthier districts, does not compel the

          conclusion that the funding provided by the State's

          financing system is insufficient to provide an adequate

          education." 267 Ill. App. 3d at 22.

     I flatly reject such a conclusion. I presently accept the

following propositions. A correlation exists between educational

resources and educational quality or opportunity. Lesser

educational resources, below a certain level, results in lower

educational quality or opportunity. Conversely, the improvement of

public education funding, up to a certain level, would

correlatively improve educational quality and uniformity of

opportunity. These propositions are widely recognized. See, e.g.,

Edgewood Independent School District v. Kirby, 777 S.W.2d 391, 393

(Tex. 1989); Board of Education, Levittown Union Free School

District v. Nyquist, 57 N.Y.2d 27, 38 n.3, 439 N.E.2d 359, 363 n.3,

453 N.Y.S.2d 643, 647 n.3 (1982); McDaniel v. Thomas, 248 Ga. 632,

637-38, 285 S.E.2d 156, 160-61 (1981); Note, State Constitutional

Analyses of Public School Finance Reform Cases: Myth or Methodol-

ogy?, 45 Vanderbilt L. Rev. 129, 129-32 (1991); J. Kozol, Savage

Inequalities: Children in America's Schools 40-82, 236 (1991)

(discussing, inter alia, disparities in educational funding,

services, and resources, and corresponding disparities in

educational quality, between Chicago public schools and suburban

school districts); see generally C. Tesconi & E. Hurwitz, Education

for Whom? The Question of Equal Educational Opportunity (1974).

     Indeed, these propositions form the very premise upon which

the Illinois public school funding scheme is based. The state's

supplementary aid is "designed to ameliorate in part the dollar

disparities generated by a system of local taxation." Robinson v.

Cahill, 62 N.J. 473, 481, 303 A.2d 273, 277 (1973); A. Schwartz,

Illinois School Finance--A Primer, 56 Chi.-Kent L. Rev. 831, 836-38

(1980). However, I acknowledge that these propositions are not

universally accepted. See, e.g., San Antonio Independent School

District v. Rodriguez, 411 U.S. 1, 42-43, 36 L. Ed. 2d 16, 48-49,

93 S. Ct. 1278, 1302 (1973); Hornbeck v. Somerset County Board of

Education, 295 Md. 597, 639, 458 A.2d 758, 780 (1983); Lujan v.

Colorado State Board of Education, 649 P.2d 1005, 1018 (Colo.

1982).

     True, the mere allegation of lack of educational resources

does not compel the conclusion that the public school funding

scheme actually fails to provide an adequate education.

Nonetheless, it cannot be said that count III is legally

insufficient. It must be remembered that this case comes to us from

the dismissal of plaintiffs' complaint. A complaint should not be

dismissed for failure to state a claim unless it clearly appears

that no set of facts could be proved under the allegations that

would entitle the party to relief. Meerbrey, 139 Ill. 2d at 473;

Ogle v. Fuiten, 102 Ill. 2d 356, 360-61 (1984).

     After carefully reviewing count III, I conclude that the

complaint states a cause of action. I would reverse the trial

court's dismissal of count III of plaintiffs' complaint.

                             Available Relief

     I would hold only that count III of plaintiffs' complaint

states a cause of action, emphasizing that this holding would not

have been a final judgment on the merits. At trial, plaintiffs

would have had the burden of presenting evidence to support their

allegations. However, under the circumstances of this case, I

believe that it is appropriate to note what relief I believe would

have been available to plaintiffs. See Horton v. Meskill, 172 Conn.

615, 650, 376 A.2d 359, 375 (1977).

     If the trial court had ultimately entered judgment in favor of

plaintiffs, then it would have been up to the legislative and

executive departments of state government to recreate and reestab-

lish a public school funding scheme that would comply with the

Illinois Constitution. The trial court could not have instructed

the General Assembly to enact any specific legislation or to raise

taxes. Likewise, the trial court could not have instructed the

Governor how to implement or enforce any public school funding

policy or plan. The trial court could not have retained juris-

diction of the case to enforce the court's orders.

     It is the duty of the judicial department of Illinois

government only to determine what the Illinois Constitution re-

quires. It is the duty of the legislative and executive departments

to carry out that requirement. I am confident that they would have

proceeded with their duty if they had been called to do so. See

Bismarck Public School District No. 1 v. State, 511 N.W.2d 247, 263

(N.D. 1994); Rose v. Council for Better Education, Inc., 790 S.W.2d

186, 212, 214 (Ky. 1989); Edgewood, 777 S.W.2d at 399.

                                CONCLUSION

     The legislative and executive departments of Illinois

government need such a call. As of this writing, it is questionable

whether they have met their constitutional duty under the education

system provision. According to one study, in the 1989-90 school

year, only one state had a greater level of disparity than Illinois

in resources available to elementary and secondary school

districts. Research Note, Variations in Expenditures Per Pupil

Within the States: Evidence From Census Data for 1989-90, 19 J.

Educ. Fin. 358 (1994).

     Unfortunately, by holding that the high quality aspect of the

education system provision is nonjusticiable, the majority today

abandons its responsibility to interpret the Illinois Constitution.

The judiciary joins the legislative and executive departments in

failing to fulfill our state government's constitutional responsi-

bility of providing for an efficient system of high quality public

education.

     For the foregoing reasons, I would reverse the judgments of

the appellate court and the circuit court of Cook County as to

count III. Accordingly, I respectfully dissent from that part of

the majority opinion that upholds the trial court's dismissal of

that count.